No. 13-2146

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

_____

MICHELLE NEMPHOS, as Legal Guardian for C.G.N.,
a Minor under the age of Eighteen,
*Plaintiff-Appellant*,

v.

NESTLE WATERS NORTH AMERICA, INC., NESTLE USA, INC.,
THE DANNON COMPANY, INC., and GERBER PRODUCTS COMPANY,
*Defendants-Appellees*.

_____

On Appeal from the United States District Court
for the District of Maryland

_____

**BRIEF FOR APPELLEES**

_____

Victoria J. Miller
Kristin M. Hadgis
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

*Counsel for Appellee*
*The Dannon Company, Inc.*

January 31, 2014

Catherine E. Stetson
Michael L. Kidney
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

Lauren S. Colton
HOGAN LOVELLS US LLP
100 International Drive, Suite 2000
Baltimore, MD 21202
(410) 659-2700

*Counsel for Appellees Nestlé USA, Inc.,*
*Nestlé Waters North America Inc., and*
*Gerber Products Company*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF THE ISSUES................................................................1

INTRODUCTION ....................................................................................1

STATEMENT OF THE CASE AND THE FACTS................................3

SUMMARY OF ARGUMENT ..............................................................17

SANDARD OF REVIEW.......................................................................19

ARGUMENT ..........................................................................................20

I.      FEDERAL LAW PREEMPTS NEMPHOS'S CLAIMS.............................20

        A.      Nemphos's Bottled-Water Claims Are Preempted ............................20

                1.      The Standard of Identity for Bottled Water
                        Preempts Nemphos's Failure-To-Warn Claims.......................22

                2.      The Standard of Identity Preempts Nemphos's
                        Claims Based on State Law Requirements For
                        Allegedly Misleading Marketing Or Advertising....................30

        B.      The "Safety" Exception Does Not Apply ...........................................34

                1.      The FDA Has Determined that Fluoride Is a Safe Food
                        Additive in Bottled Water ........................................................35

                2.      Dental Fluorosis Is Not a "Safety" Concern............................37

II.     NEMPHOS'S INFANT FORMULA AND BABY FOOD CLAIMS
        ARE PREEMPTED ..................................................................................40

        A.      Nemphos's Claims Are Preempted Because They Are
                "Implied Nutrient Content Claims" ....................................................40

      B.     Nemphos's Claims Also Are Preempted Because They Are "Health Claims" ..................................................................45

III.    THE DISTRICT COURT CORRECTLY DENIED LEAVE TO AMEND ...........................................................................48

CONCLUSION .........................................................................49

STATEMENT REGARDING ORAL ARGUMENT ...........................................50

CERTIFICATE OF COMPLIANCE ....................................................51

CERTIFICATE OF SERVICE ........................................................52

# TABLE OF AUTHORITIES

Page

CASES:

*Ackerman v. Coca-Cola Co.*,
  CV-09-0395 (JG), 2010 WL 2925955 (E.D.N.Y. July 21, 2010) ......................30

*Bates v. Dow Agrosciences L.L.C.*,
  544 U.S. 431 (2005)...................................................................5, 28, 43

*Chacanaca v. Quaker Oats Co.*,
  752 F. Supp. 2d 1111 (N.D. Cal. 2010) ...............................................44

*Cozzarelli v. Inspire Pharm. Inc.*,
  549 F.3d 618 (4th Cir. 2008) ............................................................19

*Dvora v. General Mills, Inc.*,
  No. CV 11-1074-GW, 2011 WL 1897349 (C.D. Cal. May 16, 2011)..............44

*Fellner v. Tri-Union Seafoods, L.L.C.*,
  539 F.3d 237 (3d Cir. 2008) .............................................................27

*Fisher v. Monster Beverage Corp.*,
  No. EDCV 12–02188–VAP, 2013 WL 4804385 (C.D. Cal. July 9, 2013)........44

*Glaser v. Enzo Biochem, Inc.*,
  464 F.3d 474 (4th Cir. 2006) ............................................................48

*Gustavson v. Wrigley Sales Co.*,
  Civ. No. 12-01861-LHK, 2013 WL 5201190 (N.D. Cal. Sept. 16, 2013) ..........6

*Henderson v. Gruma Corp.*,
  No. CV 10-04173-AHM, 2011 WL 1362188 (C.D. Cal. Apr. 11, 2011) ...........4

*In re Bisphenol-A (BPA) Polycarbonate Plastic Products Liab. Litig.*,
  MDL 1967, 2009 WL 3762965 (W.D. Mo. Nov. 9, 2009) ...................6, 7, 9, 36

*In re PepsiCo, Inc., Bottled Water Mktg. & Sales Practices Litig.*,
  588 F. Supp. 2d 527 (S.D.N.Y. 2008) .........................................*passim*

*Kordel v. United States*,
  335 U.S. 345 (1949).......................................................................5, 30

*Lockwood v. Conagra Foods, Inc.*,
    597 F. Supp. 2d 1028 (N.D. Cal. 2009)............................................................26

*Medtronic v. Lohr*,
    518 U.S. 480 (1996)........................................................................................21

*Mills v. Giant of Md., LLC*,
    441 F. Supp. 2d 104 (D.D.C. 2006)..........................................................*passim*

*Mills v. Giant of Md., LLC*,
    508 F.3d 11 (D.C. Cir. 2007)...........................................................................25

*Monroe v. City of Charlottesville, Va.*,
    579 F.3d 380 (4th Cir. 2009) ..........................................................................19

*Moss v. Parks Corp.*,
    985 F.2d 736 (4th Cir. 1993) ..........................................................................28

*Nat'l Broiler Council v. Voss*,
    44 F.3d 740 (9th Cir. 1994) ............................................................................27

*Natural Res. Def. Council, Inc. v. E.P.A.*,
    812 F.2d 721 (D.C. Cir. 1987)...................................................................39, 40

*Purepac Pharm. Co. v. Thompson*,
    354 F.3d 877 (D.C. Cir. 2004)........................................................................39

*Red v. Kraft Foods, Inc.*,
    754 F. Supp. 2d 1137 (C.D. Cal. 2010) ..........................................................26

*Red v. Kroger Co.*,
    No. CV 10-01025-DMG, 2010 WL 4262037 (C.D. Cal. Sept. 2, 2010) ..........44

*Riegel v. Medtronic*,
    552 U.S. 312 (2008)........................................................................................21

*Taradejna v. Gen. Mills, Inc.*,
    909 F. Supp. 2d 1128 (D. Minn. 2012).............................................................8

*Turek v. Gen. Mills, Inc.*,
    662 F.3d 423 (7th Cir. 2011) ....................................................................*passim*

*United States v. Oregon*,
   366 U.S. 643 (1961) ................................................................29

*Vermont Pure Holding v. Nestle Waters North America*,
   No. Civ. A. 03-11465, 2006 WL 839486 (D. Mass. Mar. 28, 2006) ...........32, 33

*Worm v. American Cyanamid Co.*,
   970 F.2d 1301 (4th Cir. 1992) ................................................28

*Yumul v. Smart Balance, Inc.*,
   No. CV 10-00927-MMM, 2011 WL 1045555 (C.D. Cal. Mar. 14, 2011).........44

**STATUTES:**

7 U.S.C. § 136(v)(b) ................................................................28

21 U.S.C. § 301 ......................................................................3

21 U.S.C. § 321 ....................................................................3, 35

21 U.S.C. § 321(m) ..............................................................5, 30

21 U.S.C. § 321(s) ..................................................................9

21 U.S.C. § 331 ......................................................................35

21 U.S.C. § 337 ......................................................................3

21 U.S.C. § 341 ..............................................................4, 7, 12, 20, 21

21 U.S.C. § 342(a)(2)(C) ........................................................35

21 U.S.C. § 343 ......................................................................3

21 U.S.C. § 343(g) ..................................................................4

21 U.S.C. § 343(q)(1) ..............................................................41

21 U.S.C. § 343(q)(2) ..............................................................41

21 U.S.C. § 343(r) ............................................................41, 42, 43

21 U.S.C. § 343(r)(1) ........................................................40, 41, 42

21 U.S.C. § 343(r)(1)(A) ....................................................41, 42, 43

21 U.S.C. § 343(r)(1)(B) .......................................................................41

21 U.S.C. § 343(r)(2)(G) ......................................................................43

21 U.S.C. § 343(r)(3)(C) .......................................................................45

21 U.S.C. § 343-1 ...........................................................................27, 36

21 U.S.C. § 343-1(a) .....................................................................*passim*

21 U.S.C. § 343-1(a)(1) .................................................................*passim*

21 U.S.C. § 343-1(a)(4) ........................................................................28

21 U.S.C. § 343-1(a)(5) .................................................................*passim*

21 U.S.C. § 343-1(b) ............................................................................25

21 U.S.C. § 348 .....................................................................................9

21 U.S.C. § 348(a) ...............................................................................35

21 U.S.C. § 348(c)(1)(A) ..................................................................8, 10

21 U.S.C. § 350a(c)(1) .........................................................................11

21 U.S.C. § 350a(d)(1) .........................................................................12

21 U.S.C. § 371 .....................................................................................3

21 U.S.C. § 393(b)(2)(A) .......................................................................3

Pub. L. No. 85-929, 72 Stat. 1784 (1958) ...........................................35

Pub. L. No. 101-535 § 6(c), 104 Stat. 2535 (1990) .............6, 15, 34, 37

RULES:

Fed. R. Civ. P. 9(b) ..............................................................................16

Fed. R. Civ. P. 12(b)(6).........................................................................19

REGULATIONS:

21 C.F.R. § 100.1(b)(5)...........................................................................5

21 C.F.R. § 100.1(c)(4) ................................................................ *passim*

21 C.F.R. § 101.4(a)(1) ........................................................................ 9

21 C.F.R. § 101.13 ............................................................................. 41

21 C.F.R. § 101.13(b) ........................................................................ 41

21 C.F.R. § 101.13(b)(2) ............................................................... 41, 42

21 C.F.R. § 101.13(b)(3) .................................................................... 43

21 C.F.R. § 101.13(q)(8) .................................................................... 42

21 C.F.R. § 101.14 ............................................................................. 41

21 C.F.R. § 101.14(a)(1) .................................................................... 45

21 C.F.R. § 101.14(a)(5) .................................................................... 45

21 C.F.R. § 101.14(e)(5) .................................................................... 45

21 C.F.R. § 101.17(e) ........................................................................ 38

21 C.F.R. § 101.65(a) ........................................................................ 42

21 C.F.R. § 101.65(b)(5) .................................................................... 42

21 C.F.R. § 101.65(c)(1) .................................................................... 42

21 C.F.R. § 101.80(a) ........................................................................ 46

21 C.F.R. § 106.30(c)(2) .................................................................... 11

21 C.F.R. Part 113 ............................................................................. 42

21 C.F.R. § 113.3(e)(3)(i) .................................................................. 23

21 C.F.R. § 131.200 ............................................................................. 8

21 C.F.R. § 131.203 ............................................................................. 8

21 C.F.R. § 131.206 ............................................................................. 8

21 C.F.R. § 165.110 ................................................................... 8, 20, 35

21 C.F.R. § 165.110(a)................................................................10

21 C.F.R. § 165.110(a)(1)...........................................................8, 20

21 C.F.R. § 165.110(a)(3)(iii)..........................................................23

21 C.F.R. § 165.110(a)(4)..........................................................9, 20, 23

21 C.F.R. § 165.110(b)(4)(ii).........................................................23, 36

21 C.F.R. § 165.110(b)(4)(ii)(A).........................................................9

21 C.F.R. § 165.110(b)(4)(ii)(A)-(D) .....................................................11

21 C.F.R. § 165.110(b)(4)(ii)(C) .........................................................9

21 C.F.R. § 165.110(c).............................................................10, 23

21 C.F.R. § 165.110(c)(3)...............................................................20

21 C.F.R. § 170.3.......................................................................37

21 C.F.R. § 170.3(i) ..................................................................7, 15

21 C.F.R. § 170.45................................................................9, 12, 35

44 Fed. Reg. 37212 (June 26, 1979) .....................................................38

47 Fed. Reg. 22712 (May 25, 1982) .....................................................39

58 Fed. Reg. 393 (Jan. 5, 1993) ........................................................39

58 Fed. Reg. 2302 (Jan. 6, 1993) .......................................................42

58 Fed. Reg. 2462 (Jan. 6, 1993) .........................................................4

59 Fed. Reg. 51030 (Oct. 6, 1994)......................................................38

60 Fed. Reg. 57076 (Nov. 13, 1995)..................................8, 9, 10, 21, 24, 34

61 Fed. Reg. 3118 (Jan. 30, 1996) ..............................................7, 15, 37

**LEGISLATIVE MATERIALS:**

H.R. Rep. No. 85-2284 (1958).....................................................7, 37, 38

H.R. Rep. No. 101-538, 1990 U.S.C.C.A.N. 3336 (1990) .........................3, 4, 6, 29

S. Rep. No. 85-2422 (1958) ...............................................................................7, 38

**OTHER AUTHORITIES:**

CDC, *Dental Fluorosis*, *available at* http://www.cdc.gov/fluoridation/safety/
  dental_fluorosis.htm (last updated July 10, 2013) ..............................................1

CDC, *Ten Great Public Health Achievements—U.S., 1900-1999* (Apr. 2,
  1999), *available at* http://cdc.gov/mmwr/preview/
  mmwrhtml/00056796.htm. ................................................................................1

CDC, *2012 Water Fluoridation Statistics*, *available at* http://www.cdc.gov/
  fluoridation/statistics/2012stats.htm (last updated November 22, 2013)............1

Department of Health and Human Services, *National Call to Action to
  Promote Oral Health*, NIH Publication No. 03-5303 (Spring 2003)..................1

FDA, *Health Claim Notification for Fluoridated Water and Reduced Risk of
  Dental Caries*, *available at* http://www.fda.gov/food/
  ingredientspackaginglabeling/labelingnutrition/ucm073602.htm
  (last updated Apr. 18, 2013) ............................................................................46

Letter from Dr. Barbara Schneeman, FDA, to Melanie Fairchild-Dzanis,
  Regulatory Discretion, Inc. (May 24, 2011)....................................................46

United States Public Health Service*, Review of Fluoride: Benefits and Risks,
  Report of the Ad Hoc Subcommittee on Fluoride of the Committee to
  Coordinate Environmental Health and Related Programs—Policy
  Recommendations* (Feb. 1991), *available at* http://www.health.gov/
  environment/ReviewofFluoride/POL.htm......................................................1, 2

## STATEMENT OF THE ISSUES

The question on appeal is whether the District Court correctly dismissed Appellant's complaint as preempted by the express preemption provision in the Food, Drug, and Cosmetic Act, as amended by the Nutrition Labeling and Education Act of 1990.

## INTRODUCTION

The Centers for Disease Control and Prevention recognizes water fluoridation as one of the "Ten Great Public Health Achievements" in the United States from 1900 to 1999.[1]  Over 210 million people in the United States receive water from fluoridated community water systems.[2]

*Too much* fluoride in one's diet, however, may lead to dental fluorosis, a change in the appearance of a tooth's enamel that can occur in children who ingest excessive fluoride.[3]  To balance the health benefits of fluoride with potential risks of excessive fluoride consumption, the United States Public Health Service recommends water fluoridation levels.[4]

---

[1]     CDC, *Ten Great Public Health Achievements—U.S., 1900-1999* (Apr. 2, 1999), *available at* http://cdc.gov/mmwr/preview/mmwrhtml/00056796.htm.

[2]     CDC, *2012 Water Fluoridation Statistics*, *available at* http://www.cdc.gov /fluoridation/statistics/2012stats.htm (last updated November 22, 2013).

[3]     CDC, *Dental Fluorosis*, *available at* http://www.cdc.gov/fluoridation/safety/ dental_fluorosis.htm (last updated July 10, 2013).

[4]     Department of Health and Human Services, *National Call to Action to Promote Oral Health*, NIH Publication No. 03-5303 (Spring 2003); United States

So does the Food and Drug Administration (FDA). The FDA allows bottled water producers to add fluoride within limits in the FDA's "standard of identity" for bottled water—the specifications of the product and its label. The bottled water products in this appeal complied with the FDA's limits, and the federal standard of identity requires no warnings or other labeling restrictions on compliant products.

Appellant Michelle Nemphos, on behalf of her minor daughter, C.G.N., claims her daughter developed dental fluorosis from drinking bottled water and baby formula and eating baby food. She sued Appellees Nestlé Waters North America Inc., Nestlé USA, Inc., The Dannon Company, Inc., and Gerber Products Company, bringing multiple state-law claims. But, as the District Court explained, Nemphos's state-law claims rely on state-law requirements for fluoride in bottled water that are not identical to the federal standard of identity, so federal law expressly preempts them.

The District Court also concluded that Nemphos's infant formula and baby food claims were similarly preempted, because they were based on state-law labeling requirements not identical to federal requirements for "nutrient content claims."

---

Public Health Service, *Review of Fluoride: Benefits and Risks, Report of the Ad Hoc Subcommittee on Fluoride of the Committee to Coordinate Environmental Health and Related Programs—Policy Recommendations* (Feb. 1991), *available at* http://www.health.gov/environment/ReviewofFluoride/POL.htm.

The District Court was correct; there is no place for state-law claims like these in the federal standard-of-identity regime. The District Court's judgment should be affirmed.

## STATEMENT OF THE CASE AND THE FACTS

**Statutory and Regulatory Background**

**The NLEA.**  The Federal Food, Drug, and Cosmetic Act (FDCA), enacted in 1938, empowers the Food and Drug Administration (FDA) to protect the public health by ensuring that "foods are safe, wholesome, sanitary, and properly labeled." 21 U.S.C. § 393(b)(2)(A).  In 1990, Congress increased FDA's oversight in the arena of food labeling by amending the FDCA and enacting the Nutrition Labeling and Education Act (NLEA), codified as amended at 21 U.S.C. §§ 301, 321, 337, 343, 371.  The NLEA was passed to "clarify and to strengthen the Food and Drug Administration's legal authority to require nutrition labeling on foods, and to establish the circumstances under which claims may be made about nutrients in foods."  H.R. Rep. No. 101-538, at 7, 1990 U.S.C.C.A.N. 3336, 3337 (June 13, 1990).

The NLEA amendments contain several express preemption provisions.  21 U.S.C. § 343-1(a) (commonly referred to as "Section 403A").  These provisions provide that States may not establish any requirement that is "not identical to" specific topics of food labeling regulated by FDA.  21 U.S.C. § 343–1(a)(1)-(5).

Congress included the express preemption provisions to help create a national and uniform food labeling system by preventing "State and local governments from adopting inconsistent requirements with respect to the labeling of nutrients or with respect to the claims that may be made about the nutrients in foods."  H.R. Rep. No. 101-538, at 7, 1990 U.S.C.C.A.N. 3336, 3337 (June 13, 1990).  As FDA has explained, Congress was aware that some "Federal requirements may preempt more restrictive State requirements in certain instances;" but on balance, Congress decided that "the net benefits from national uniformity in these aspects of the food label outweigh the loss in consumer protection that may occur as a result."  58 Fed. Reg. 2462, 2462 (Jan. 6, 1993).

The preemption provision at issue in this appeal reads in pertinent part:

(a)    [N]o State or political subdivision of a State may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce—

(1) any requirement for a food which is the subject of a standard of identity established under section 341 of this title that is not identical to such standard of identity or that is not identical to the requirement of section 343(g) of this title [regarding misbranding for noncompliance with a standard of identity], except that this paragraph does not apply to a standard of identity of a State or political subdivision of a State for maple syrup that is of the type required by sections 341 and 343(g) of this title[.]

* * *

- 4 -

(5) any requirement respecting any claim of the type described in section 343(r)(1) of this title made in the label or labeling of food that is not identical to the requirement of section 343(r) of this title, except a requirement respecting a claim made in the label or labeling of food which is exempt under section 343(r)(5)(B) of this title.

21 U.S.C. § 343-1(a).

The NLEA thus expressly preempts a state "requirement" that is "not identical to" a federal standard relating to a product or its labeling. "Labeling" includes "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m); *see also Kordel v. United States*, 335 U.S. 345, 351 (1949) ("labeling" includes sales literature or "advertising which performs the function of labeling").

The term "requirement" in the context of express preemption provisions is read broadly; it includes statutes, regulations, and common-law duties. *Bates v. Dow Agrosciences L.L.C.*, 544 U.S. 431, 443 (2005); 21 C.F.R. § 100.1(b)(5) (interpreting the term "requirement" under the NLEA to include "any statute, standard, regulation, or other requirement that is issued by a State"); *see also In re PepsiCo, Inc., Bottled Water Mktg. & Sales Practices Litig.*, 588 F. Supp. 2d 527, 532 (S.D.N.Y. 2008). And FDA has explained that "not identical to" "means that the State requirement directly or indirectly imposes obligations or contains provisions concerning the composition or labeling of food, or concerning a food

- 5 -

container, that" are not imposed by or differ from those imposed by or contained in the applicable federal regulations. 21 C.F.R. § 100.1(c)(4); *see Gustavson v. Wrigley Sales Co.*, Civ. No. 12-01861-LHK, 2013 WL 5201190, at *13-14 (N.D. Cal. Sept. 16, 2013) (express preemption applied where the standard of identity for milk chocolate did not require the disclaimer plaintiffs sought). This construction ensures national uniformity; after all, if inconsistent state requirements were permitted for topics already regulated by FDA, States could develop a patchwork of warnings and requirements, undermining the national system of food labeling and packaging established by the NLEA. *See* H.R. Rep. No. 101-538, at 7, 1990 U.S.C.C.A.N. 3336, 3337 (June 13, 1990).

The NLEA contains a narrow exception to express preemption that permits "a warning concerning the safety of the food or component of the food." Pub. L. No. 101-535 § 6(c), 104 Stat. 2353, 2364 (1990). This exception – commonly referred to as the "safety exception" – takes duties created by state law out of the express preemption provisions of the NLEA *if* the relevant state requirement implicates a "safety" concern as that term is understood by FDA. *Mills v. Giant of Md., LLC*, 441 F. Supp. 2d 104, 108-109 (D.D.C. 2006); *see also In re Bisphenol-A (BPA) Polycarbonate Plastic Products Liab. Litig.*, MDL 1967, 2009 WL 3762965, at *6 (W.D. Mo. Nov. 9, 2009) (hereinafter "*In re BPA*") (discussing "safety" exception). FDA defines "safe" or "safety" to mean "that there is

- 6 -

reasonable certainty in the minds of competent scientists that the substance is not harmful under the intended constitutions of use." 21 C.F.R. § 170.3(i). Safety, however, does not require a demonstration of "absolute harmlessness." See 61 Fed. Reg. 3118, 3119 (Jan. 30, 1996) (citing H.R. Rep. No. 85-2284, at 4-5 (1958); S. Rep. No. 85-2422, at 2 (1958)). Rather, "harm" means "the capacity to injure or otherwise damage the health of individuals consuming the additive." *Id*. A food is "harmful" if it is "hazardous to the health of man or animal," or can cause "significant adverse health consequences." *Id*. at 3119, 3168. State law requirements that target levels of ingredients determined by FDA to be "safe" or not "harmful" cannot escape preemption under the "safety" exception. *See In re BPA*, 2009 WL 3762965, at *6 (safety exception did not apply to expressly preempted state-law claims for the disclosure of epoxy liners made with BPA, as "Congress expressed its intent that states occupy a more restricted role in the context of food ingredient labeling, and applying the safety exception with deference to the FDA's determination of safety effectuates Congress' intent.").

**Standards of Identity.** Pursuant to Section 401 of the FDCA, the FDA may create "regulations fixing and establishing for any food * * * a reasonable definition and standard of identity, a reasonable standard of quality, or reasonable standards of fill of container." 21 U.S.C. § 341. The FDCA also allows FDA to

- 7 -

determine when and under what conditions "food additives" may be safely used.
21 U.S.C. § 348(c)(1)(A).

Since passage of the FDCA in 1938, FDA has promulgated and adopted
"standards of identity" for a number of foods.  A standard of identity typically
defines the permissible composition of a given food, prescribes a formulation or
acceptable range of ingredients, assigns a name under which conforming products
shall be sold, and may prescribe labeling requirements based on ingredients in the
food.  *See*, *e.g.*, *Taradejna v. Gen. Mills, Inc.*, 909 F. Supp. 2d 1128, 1130 (D.
Minn. 2012) (discussing FDA's standard of identity for "yogurt" as including
permissible ingredients, the process for manufacture, and the presence of optional
ingredients) (citing 21 C.F.R. §§ 131.200, 131.203, 131.206).

FDA regulates bottled water as a food under the FDCA and has established a
standard of identity for bottled water.  21 C.F.R. § 165.110.  Bottled water is
defined as "water that is intended for human consumption and that is sealed in
bottles or other containers with no added ingredients except that it may optionally
contain safe and suitable antimicrobial agents."  21 C.F.R. § 165.110(a)(1).

**Fluoride in Bottled Water.**  In creating the standard of identity for bottled
water, and in response to public comments that added fluoride may provide a
benefit to consumers, FDA included fluoride as an optional ingredient.  60 Fed.
Reg. 57076, 57079 (Nov. 13, 1995); *see also id*. § 165.110(a)(1) (providing that

- 8 -

"[f]luoride may be optionally added within the limitations established in" the standard of quality). Where fluoride is added, bottled water becomes a multi-ingredient food, to which FDA requires a label be affixed listing the ingredients. See 21 C.F.R. § 165.110(a)(4); *see also* 60 Fed. Reg. 57076, 57079 (citing 21 C.F.R. § 101.4(a)(1)).

FDA has concluded that the following levels of fluoride are acceptable in bottled water products:

- *Naturally occurring* fluoride cannot exceed a range between 1.4 and 2.4 ppm for bottled water packaged in the United States, depending upon air temperature at the location where the bottled water is sold at retail, 21 C.F.R. § 165.110(b)(4)(ii)(A); and

- Fluoride may be *added* to bottled water manufactured in the United States at between 0.8 and 1.7 ppm, depending upon air temperature at the location where the bottled water is sold at retail. *Id*. § 165.110(b)(4)(ii)(C).

The FDCA presumes that ingredients that fall within the definition of "food additive" are unsafe until approved for use by FDA. 21 U.S.C. § 348; *see also* 21 U.S.C. § 321(s) (defining "food additive"); *In re BPA*, 2009 WL 3762965, at *1. But – and importantly for this appeal – FDA has determined that fluoride is a safe "food additive" when found in the concentrations permitted by FDA regulation. 21 C.F.R. § 170.45 (referencing acceptable levels of fluoride, as set forth in the bottled water standard of identity).

- 9 -

When FDA concludes that an additive is safe, it is required by the FDCA to regulate conditions for that additive's safe use, including "any directions or other labeling or packaging requirements for such additive deemed necessary by [the Secretary] to assure the safety of such use." 21 U.S.C. § 348(c)(1)(A). In creating the standard of identity for bottled water, FDA considered the amount of safe and acceptable fluoride, and specifically considered whether a warning for fluoride should be required. 60 Fed. Reg. at 57079-80. In responding to public comments, FDA concluded that it "does not agree" that it is necessary to impose a requirement for a mandatory statement on bottled water that products containing 0.3 ppm or more of fluoride when taken with a fluoride supplement may cause unwanted aesthetic effects in young children. *Id.* at 57080. As the FDA explained:

> There are allowable levels for fluoride in the quality standard, and bottled water exceeding these levels must be labeled as substandard. The allowable levels are related to secondary levels established by the Environmental Protection Agency (EPA) for public drinking water in 40 CFR parts 141 and 143 and take into consideration excessive infant fluoride intake. In addition, as discussed in the previous comment, the Surgeon General's Report recommends an optimal level of 1.0 ppm fluoride in drinking water.

*Id.* Accordingly, the FDA concluded that it would not require a warning regarding dental fluorosis in the standard of identity. *See* 21 C.F.R. 165.110(a).

The FDA does, however, set forth the circumstances in which certain warnings are required. 21 C.F.R. § 165.110(c). A bottled water product must contain the phrase "Contains Excessive Fluoride" or "Contains Excessive

Chemical Substances" if the level of fluoride exceeds the levels set forth in subsections 165.110(b)(4)(ii)(A)-(D). If a bottled water product contains an acceptable level of fluoride, however, FDA requires no disclaimer, warning, or package modification in relation to fluoride content.

It is undisputed that the Appellees' bottled water products identified in the complaint all contain added fluoride in amounts within the permissible threshold in the bottled water standard of identity. *See* JA 5.

**Infant Formula.** Infant formulas marketed in the United States are also subject to comprehensive regulatory requirements. When a manufacturer intends to market an infant formula that has undergone a "major change" in "processing or formulation," it must fulfill registration, notification, and verification obligations set forth in the FDCA. 21 U.S.C. § 350a(c)(1). A "major change" is defined as "any new formulation, or any change of ingredients or processes where experience or theory would predict a possible significant adverse impact on levels of nutrients or availability of nutrients." 21 C.F.R. § 106.30(c)(2). At least 90 days before marketing such a product, the manufacturer must submit to FDA (1) a quantitative description of the formula, (2) a description of any reformulation or change in processing, (3) assurances that the formula will not be marketed unless it has the required nutrients and quality factors as demonstrated by testing, and (4) assurances that the formula's processing complies with good manufacturing

- 11 -

practices (GMPs) and quality control procedures.  *See* 21 U.S.C. § 350a(d)(1).  The formula will be considered adulterated—and therefore unmarketable—if proper notification is not provided.

The food additive regulations specifically prohibit the addition of fluoride to infant formula, and all other foods regulated by FDA other than bottled water.  *See* 21 C.F.R. § 170.45.

**Baby Food.**  Baby food is similarly within FDA's regulatory purview and is subject to the FDCA's provisions applicable to all foods.  *See* 21 U.S.C. §§ 341-343.  Baby food is thus subject to the FDA's regulations governing fluoride as a food additive.  21 C.F.R. § 170.45.  Pursuant to this regulation, manufacturers may not *add* fluoride as an ingredient in baby food, but it is permissible for fluoride to be present in baby food—if, for example, it is present as a result of the use of municipal water that contains fluoride in the manufacture of the food product.  *Id.*

**Proceedings Below**

Appellant Michelle Nemphos filed a federal lawsuit against Appellees Nestlé Waters North America Inc., Nestlé USA, Inc., The Dannon Company, Inc., and Gerber Products Company in September 2012.  JA 8-26.[5]  Nemphos alleged

---

[5]    Nemphos first filed a complaint against Nestlé Waters North America Inc., Nestlé USA, Inc., and Gerber Products Company in the District Court in August 2011.  She filed an amended complaint in September.  But she voluntarily dismissed that action in February 2012.  Nemphos filed the operative complaint

that her minor daughter, C.G.N., consumed Poland Spring fluoridated bottled water and Dannon Fluoride to Go bottled water from six months of age to approximately eight years of age.  JA 12-13.  Nemphos's complaint also alleged that C.G.N. consumed Carnation Good Start infant formula from her birth in 1997 until she was about one year old.  JA 12.  C.G.N. also allegedly consumed unspecified types of Gerber brand baby food, as well as "Gerber brand apple juice," from four months to one year of age.  JA 12.  The complaint does not allege that either the infant formula or the baby food contained any *added* fluoride; nor does the complaint allege that the apple juice contained any fluoride at all.

Nemphos claimed that C.G.N. developed dental fluorosis, an "aesthetic effect" characterized by "mottled enamel and pitting of the teeth," as a result of C.G.N.'s consumption of water, formula, and baby food.  JA 28, 43.  The complaint asserts six state-law causes of action: strict liability (Count I), negligence (Count II), breach of implied warranties (Count III), fraud (Count IV), negligent infliction of emotional distress (Count V), and violations of the Maryland Consumer Protection Act (Count VI).  JA 13-25.

---

here seven months after that, and added The Dannon Company, Inc. as a defendant solely with respect to claims regarding fluoridated bottled water.

The U.S. District Court for the District of Maryland dismissed Nemphos's complaint without leave to amend, on multiple grounds.[6] To begin with, the District Court found that Nemphos's claims regarding fluoridated bottled water were preempted by 21 U.S.C. § 343-1(a)(1). As the court explained, FDA promulgated a standard of identity for bottled water which allows fluoride to be added to bottled water at the levels identified in the complaint. JA 37-38. All of the bottled water at issue in Nemphos's complaint complied with the FDA's standard of identity. JA 38. The court further explained that "no FDA regulation requires a warning regarding dental fluorosis" if the water contained fluoride within federally established limits. *Id.*

The District Court next examined Nemphos's infant formula and baby food claims. As it explained, the FDA prohibits adding fluoride to baby food and infant formula, and "Nemphos does not allege that Nestle and Gerber violated these regulations or added fluoride." JA 38. In addition, "federal law does not require products containing no added fluoride to bear information concerning dental fluorosis." *Id.* (citing *Turek v. Gen. Mills, Inc.*, 662 F.3d 423, 427 (7th Cir. 2011)).

After examining the statutory and regulatory background behind each of the products Nemphos challenged, the District Court concluded that Nemphos's claims were preempted. All of the challenged products "adhere to these [federal] labeling

---

[6]     Nemphos voluntarily dismissed Count V, for negligent infliction of emotional distress; Maryland law does not recognize such a claim. *See* JA 27.

requirements," and "the FDCA does not demand the Defendants warn of dental fluorosis." JA 39. Thus, "granting Nemphos relief would * * * impose an obligation upon [defendants] to warn customers of the risks of fluoride consumption." *Id.* Such an "obligation to warn would be non-identical to the FDCA's labeling requirements." *Id.*

The District Court also considered whether the NLEA's limited exception to preemption for "a warning concerning the safety of the food or component of the food," Pub. L. No. 101-535, § 6(c), 104 Stat. 2353, 2364 (1990), applied. The court observed that "safety" in the context of food additives is a term defined by the FDA to mean that there is "a reasonable certainty in the minds of competent scientists that the substance is not harmful under the intended conditions of use." JA 44 (quoting 21 C.F.R. 170.3(i)). And "harm," in turn, means "the capacity to injure or otherwise damage the health of individuals consuming the additive." JA 44 (quoting 61 Fed. Reg. 3118, 3119 (Jan. 30, 1996)).

The court concluded that the safety exception did not apply to Nemphos's claims for two reasons. First, the FDA approved the use of fluoride as a food additive in bottled water—a regulatory action that the FDCA predicates on the FDA's finding that the use of an additive is "safe." JA 44. Because the "FDA has already determined that fluoride is safe to include in bottled water * * * if manufacturers abide by its regulations" and "Nemphos's allegations show the

Defendants complied with those regulations," there was no "safety" issue. *Id.*
Second, as the court observed, the FDA considered fluorosis an "aesthetic effect"
rather than a "safety concern," so "the safety concern exception is inapplicable to
Nemphos's case." JA 45.

Thus, because "assigning common law liability would [] create a state
requirement precisely prohibited by the FDCA," the District Court dismissed
Nemphos's claims as preempted.  JA 39.

The District Court also concluded that several of Nemphos's claims were
deficient for other reasons.  Her fraud (Count IV) and Maryland Consumer
Protection Act (Count VI) claims, which were based on allegations of unfair and
deceptive trade practices, were also dismissed because Nemphos had failed to
plead these claims with particularity under Rule 9(b).  JA 46-47.  And Nemphos's
breach of warranty claim was time-barred to the extent it claimed breach of
implied warranty of merchantability, JA 49, and deficient to the extent it claimed
breach of implied warranty of fitness for a particular purpose, JA 50.

Nemphos had sought leave to file a fourth version of her complaint, in the
event the District Court concluded her claims should be dismissed.  The District
Court denied that request as futile, because Nemphos would be unable to plead her
way out from under the FDCA's express preemption provision.  JA 50-51.  The
court accordingly dismissed Nemphos's complaint with prejudice.  *Id.*

Nemphos filed a timely appeal.  She does not, however, challenge all of the District Court's rulings.  She does not appeal the dismissal of her design-defect claims.  Nor does she appeal the District Court's alternative rulings on her fraud, MCPA, and breach of warranty claims.

## SUMMARY OF ARGUMENT

The District Court correctly dismissed Nemphos's state-law claims as expressly preempted.  Where the FDA has established a standard of identity for a food—as it has for bottled water—21 U.S.C. § 343-1(a)(1) preempts any state-law requirement that is "not identical" to the requirements in the FDA's standard of identity.  "Not identical" means just that, and the FDA has interpreted that broad phrase to include state requirements or duties "not imposed by or contained in," or that "differ from" the federal standard.  21 C.F.R. § 100.1(c)(4).

The parties do not dispute that the bottled water against which Nemphos makes her claims was within the federal limits for fluoride.  The FDA's standard of identity for bottled water does not require any warning or prohibit any marketing statements concerning fluoride at these levels; it requires only that fluoride be listed as an ingredient.  Thus, whether styled as claims for failure-to-warn or misleading marketing, Nemphos attempts to assert that Maryland law creates requirements for the labeling of bottled water that are not identical to the requirements of the FDA's standard of identity.  There is no exception to

- 17 -

preemption for non-identical requirements for warnings or marketing.  This is particularly apparent here, where the FDA's standard of identity for bottled water governs fluoride content, fluoride labeling, and warning labeling—and the FDA expressly determined not to require dental fluorosis labeling.  The District Court correctly found Nemphos's bottled water claims preempted.

The District Court also correctly concluded that the NLEA's limited "safety" exception does not apply in this case.  The FDA found that it was safe to add fluoride to bottled water in the amounts allowed by the FDA's standard of identity when the agency approved fluoride as a food additive in bottled water.  And the FDA considers dental fluorosis an "aesthetic" concern rather than a "safety" concern under the FDA's definition of "safety" in the context of food additives.

The District Court also correctly dismissed Nemphos's infant-formula and baby-food claims under 21 U.S.C. § 343-1(a)(5)'s preemption of state-law requirements for food labeling "not identical" to federal requirements for "nutrient content claims."  A claim that describes a food or an ingredient in a manner that suggests that a nutrient is present in a certain amount is a "nutrient content claim." Labeling regarding dental fluorosis implies that a product contains fluoride at certain levels, and the FDA does not require such labeling on infant formula or baby food.

- 18 -

The District Court also would not have erred in dismissing Nemphos's baby-food and formula claims based on 21 U.S.C. § 343-1(a)(5)'s preemption of state-law requirements for food labeling "not identical" to federal requirements for "health claims."  But having concluded that "nutrient content claim" preemption barred Nemphos's infant formula and baby food claims, it was not necessary for the District Court to find "health claim" preemption to dismiss these claims.

Finally, the District Court correctly declined, in its broad discretion, to permit Nemphos leave to file a fourth version of her complaint.  As the District Court pointed out, her claims were preempted; she would not be able to plead around that inalterable fact.

The District Court's dismissal of Appellant's complaint should be affirmed.

## STANDARD OF REVIEW

The District Court's dismissal of Nemphos's complaint under Rule 12(b)(6) is reviewed *de novo*.  *Monroe v. City of Charlottesville, Va.*, 579 F.3d 380, 385 (4th Cir. 2009).  Its conclusion that it would not grant Nemphos leave to file a fourth version of her complaint is reviewed for abuse of discretion.  *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 630 (4th Cir. 2008).

- 19 -

**ARGUMENT**

**I.    FEDERAL LAW PREEMPTS NEMPHOS'S CLAIMS.**

**A.  Nemphos's Bottled-Water Claims Are Preempted.**

The District Court correctly held that federal law preempts Nemphos's state

law claims regarding fluoridated bottled water products because these claims

necessarily rely on state law requirements that are not identical to the FDA's

standard of identity for bottled water.

Acting under the authority in 21 U.S.C. § 341, the FDA has established a

standard of identity and a standard of quality for bottled water.  *See* 21 C.F.R.

§ 165.110.  Bottled water with added fluoride manufactured in the United States

may contain up to between 0.8 and 1.7 ppm fluoride depending on the air

temperature where the bottled water is sold at retail.  *Id.* § 165.110(a)(1),

(b)(4)(ii)(C).  The FDA's standard of identity for bottled water also dictates its

labeling:  it does not require any warning concerning fluoride at levels that fall

within the ranges allowed by the standard of identity.  *Id.* § 165.110.  When bottled

water with added fluoride contains fluoride levels that fall within these ranges, the

FDA's standard of identity requires only that fluoride be listed as an ingredient.

*Id.* § 165.110(a)(4).  The FDA does require, however, that if fluoride levels exceed

the levels allowed in the standard of identity, manufacturers must provide

additional labeling.  21 C.F.R. § 165.110(c)(3).  The FDA specifically considered

requiring a warning regarding dental fluorosis—but declined to require any such warning in its standard of identity, concluding that "FDA does not agree that this statement should be mandatory on all bottled waters containing 0.3 ppm or more fluoride." 60 Fed. Reg. at 57080.

The NLEA gives the FDA's standard of identity for bottled water preemptive effect. Under 21 U.S.C. § 343-1(a)(1), "no State or political subdivision of a State may directly or indirectly establish * * * any requirement for a food which is the subject of a standard of identity established under section 341 of this title that is not identical to such standard of identity." This express preemption language should be interpreted "in a manner 'substantially informed' " by FDA regulations. *Riegel v. Medtronic*, 552 U.S. 312, 322 (2008) (quoting *Medtronic v. Lohr*, 518 U.S. 480, 495 (1996)). And the FDA's implementing regulations provide that the statute's prohibition on requirements that are "not identical" to the federal standard of identity extends to any state requirement that:

> directly or indirectly imposes obligations or contains provisions concerning the composition or labeling of food, or concerning a food container, that:
>
> (i) Are not imposed by or contained in the applicable provision (including any implementing regulation) of section 401 or 403 of the [FDCA]; or
>
> (ii) Differ from those specifically imposed by or contained in the applicable provision (including any implementing regulation) of section 401 or 403 of the [FDCA].

- 21 -

21 C.F.R. § 100.1(c)(4).

The District Court held that all of Nemphos's claims regarding fluoride in bottled water rested on state common law or statutory duties that were not identical to the FDA's standard of identity for bottled water—and are therefore preempted. That was correct.

### 1. The Standard of Identity for Bottled Water Preempts Nemphos's Failure-To-Warn Claims.

Nemphos's core preemption argument on her failure-to-warn claim is that the standard of identity for bottled water "does not govern the warning statement at issue here." Appellant's Br. 35. That argument ignores the plain language of Section 343-1(a)(1), its implementing regulations, and FDA's rejection of a mandatory fluoride-related warning when drafting the standard of identity.

Section 343-1(a)(1) preempts any state law requirement for "a food which is the subject of a standard of identity," unless that requirement is "identical to such standard of identity." State requirements are not "identical to" a federal standard of identity if they "[a]re not imposed by or contained in" the standard, or if they "[d]iffer from those specifically imposed by or contained in" the standard. 21 C.F.R. § 100.1(c)(4). Nothing in these preemption provisions distinguishes among different aspects of the label, or between statements characterized as warnings and other statements. And as the District Court correctly explained, granting Nemphos

the relief she sought would "impose an obligation" to warn that federal law did *not* require—rendering it "non-identical to the FDCA's labeling requirements."  JA 39.

Against this straightforward analysis, Nemphos offers several countertextual challenges.  First, she argues that "states are free to regulate what the federal standard of identity does not." Appellant's Br. 32.  The text of Section 343-1(a)(1) and its implementing regulations do not support such an exception.  But even if Nemphos were correct, the problem is that the text of the FDA's standard of identity for bottled water *extends* to warnings.  The governing standard of identity provides, among other things, that "[w]hen the label or labeling of a bottled water product states or implies (e.g., through label statements or vignettes with references to infants) that the bottled water is for use in feeding infants, and the product is not commercially sterile under 113.3(e)(3)(i) of this chapter, the product's label shall bear conspicuously and on the principal display panel the statement 'Not sterile.  Use as directed by physician or by labeling directions for use of infant formula.' " 21 C.F.R. § 165.110(a)(3)(iii).  Yet the standard of identity requires no warning regarding dental fluorosis; it requires only that fluoride be listed as an ingredient.  *Id.* § 165.110(a)(4).  It is only when fluoride levels in bottled water exceed the levels in FDA's standard of quality at 21 C.F.R. § 165.110(b)(4)(ii) that FDA requires the warning "Contains Excessive Fluoride" or "Contains Excessive Chemical Substances."  *Id.* § 165.110(c).

- 23 -

The standard of identity for bottled water does not require warnings regarding fluoride because the FDA considered and expressly rejected requiring such a warning—not because standards of identity generally or this standard of identity in particular "do not govern warnings." Appellant's Br. 31. When the FDA enacted the standard of identity for bottled water in 1995, it declined to require a fluorosis warning. 60 Fed. Reg. at 57080. As the agency explained, "[t]here are allowable levels for fluoride in the quality standard, and *bottled water exceeding these levels must be labeled as substandard*." *Id.* (emphasis added). Thus, any state-law requirement for a warning about consumption of fluoride at or below the levels in the federal standard of identity would be a non-identical state requirement.

The District Court for the District of Columbia's opinion in *Mills v. Giant of Maryland*, 441 F. Supp. 2d 104, 105 (D.D.C. 2006), further supports the proposition that 21 U.S.C. 343-1(a)(1) preempts warning requirements in addition to what an FDA-established standard of identity requires. The plaintiffs in *Mills* brought negligence and strict liability claims based on the failure to include a warning on milk regarding lactose intolerance. They also alleged that, despite the prevalence of lactose intolerance, the defendants "propagated the myth that milk is a necessary part of a healthy diet while simultaneously stifling information about the incidence of lactose intolerance." *Id.* at 105. The *Mills* court held that 21

- 24 -

U.S.C. 343-1(a)(1) preempted the plaintiffs' negligence and strict liability claims based on the alleged failure to label milk with warnings regarding lactose intolerance. Because FDA's standard of identity for milk did not require a warning regarding lactose intolerance, the plaintiffs' claims relied on a state law requirement that was "not identical" to the FDA's standard of identity for milk and were thus preempted. *Id.* at 108.

Moreover, the *Mills* court noted, the "FDCA contemplates the possibility of deviation from the standard of identity, but only following a formal application to FDA." *Id.* Section 343-1(b) allows the FDA, "[u]pon petition of a State," to enact regulations exempting state requirements that meet certain criteria from preemption under § 343-1(a). But the plaintiffs, like Appellant here, "[sought] to circumvent this process through the instant litigation, which is yet another reason why the duties imposed by the [] common law are not congruent with the strictures of the FDCA." *Id.*[7] *See also In re PepsiCo, Inc.*, 588 F. Supp. 2d at 538-539 (S.D.N.Y. 2008) (rejecting argument that state-law requirements are permitted to go "beyond federal law" where the standard of identity does not explicitly regulate the terms or images at issue).

---

[7]    On appeal, the D.C. Circuit affirmed on state-law grounds, which made it unnecessary to address preemption. *Mills v. Giant of Md., LLC*, 508 F.3d 11, 15 (D.C. Cir. 2007).

In response to all this, Nemphos does not argue that *Mills* is distinguishable in any respect—only that it was "wrongly decided." Appellant's Br. 38-39. But she cites no case questioning the *Mills* court's preemption analysis. Instead, she relies on three other cases—*none* of which holds that state law can impose liability for not providing a warning when a standard of identity does not require one.

*Red v. Kraft Foods, Inc.*, 754 F. Supp. 2d 1137 (C.D. Cal. 2010) did not involve a food subject to a standard of identity or preemption under 21 U.S.C. 343-1(a)(1). It involved claims that various affirmative statements such as "good source of Calcium" and "made with real vegetables" misleadingly suggested that certain food products were healthful. *Id.* at 1144. The court allowed the plaintiffs to maintain claims about some of the suspect statements, but not all, because only some were subject to preemption under a separate subsection of the preemption provision, 21 U.S.C. 343-1(a)(5), having to do with requirements for health and nutrient content claims.

*Lockwood v. Conagra Foods, Inc.*, 597 F. Supp. 2d 1028 (N.D. Cal. 2009), is, like *Red*, another California case, and like *Red*, did not involve a food subject to a standard of identity or preemption under 21 U.S.C. 343-1(a)(1). Instead, the *Lockwood* court allowed claims regarding the allegedly misleading use of the words "all natural" in the labeling of pasta sauce because "the FDA * * * has declined to adopt any regulations governing this term." *Id.* at 1034.

- 26 -

Finally, Nemphos cites *Fellner v. Tri-Union Seafoods, L.L.C.*, 539 F.3d 237 (3d Cir. 2008). *Fellner* is an *implied* preemption case involving allegations of "severe mercury poisoning" where the reference to the NLEA is a footnote explaining that "[the NLEA] includes an express preemption provision, 21 U.S.C. § 343-1, but Tri-Union does not urge that it governs this case. The inclusion of express preemption provisions does not preclude the operation of ordinary implied preemption principles."[8] *Id.* at 241, 243 n.2. None of the three cases on which Nemphos relies is at all apposite. *Mills* is apposite—and Nemphos has no answer to it.

Nemphos next argues that Section 343-1(a)(1) does not cover warning labels, on the ground that the language "not identical to" in 21 U.S.C. § 343-1(a)(1) does not include "in addition to." Appellant's Br. 33. That is meritless. The FDA reads "not identical" to preempt state requirements "not imposed by or contained in" or that "differ from" federal requirements. 21 C.F.R. § 100.1(c)(4). So do the courts. *Nat'l Broiler Council v. Voss*, 44 F.3d 740, 745 (9th Cir. 1994) (" 'Not identical' and 'in addition to, or different than' are not distinguishable under any fair construction of the phrases.").

---

[8]     Nemphos's arguments that implied preemption has not previously been found under the NLEA miss the point; here, FDA issued regulations about the fluoride content of bottled water. *See* Appellant's Br. 11-12, 13. The standard of identity is given *express* preemptive force through 21 U.S.C. § 343-1(a)(1).

Nemphos also contends that the phrase "any requirements for labeling or packaging" in the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 136(v)(b), is broader than the words "any requirement" in the NLEA. Appellants' Br. 32-33 (citing *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431 (2005)). But this Court already has rejected Nemphos's argument, explaining that the language "for labeling or packaging" in FIFRA meant only that " 'Congress did not reveal an intent to supplant state authority' beyond the area of labeling and packaging." *Moss v. Parks Corp.*, 985 F.2d 736, 739 (4th Cir. 1993) (citing *Worm v. American Cyanamid Co.*, 970 F.2d 1301, 1306 (4th Cir. 1992)). The text of the NLEA further confirms the point. If Congress intended to limit preemption of "any requirement" in 21 U.S.C. § 343-1(a)(1) as Nemphos suggests, then Congress would have done so—much as it did in 21 U.S.C. § 343-1(a)(4), which applies to "any requirement *for nutrition labeling of food*." (emphasis added).

Next, citing legislative history, Nemphos argues that the NLEA's preemption provision is limited to "positive nutritional food labeling." Appellant's Br. 35. That is again not so. Each prong of the NLEA's preemption provision applies to "any requirement" of state law that is "not identical" to aspects of federal law and regulations. The NLEA is not limited to "positive requirements." 21 U.S.C. §§ 343-1(a)(1)-(5). And because the NLEA's text is clear, there is no need to entertain arguments that the NLEA's legislative history mandates a reading

at odds with its text. *See United States v. Oregon*, 366 U.S. 643, 648 (1961)

("Having concluded that the provisions of § 1 are clear and unequivocal on their

face, we find no need to resort to the legislative history of the Act.").  Moreover,

Nemphos's legislative history argument is based entirely on the observation that

while the NLEA was in the House Committee on Energy and Commerce's

Subcommittee on Health and the Environment, Rep. John Dingell (D-MI), the

Subcommittee chairman, ruled that an amendment regarding warnings offered by

Rep. Edward Madigan (R-IL) was "not germane."  H.R. Rep. No. 101-538, 1990

U.S.C.C.A.N. 3336, 3340.  Allowing a single subcommittee parliamentary ruling

to contravene the plain text of a statute would be a first.[9]

Accordingly, the District Court correctly found that Nemphos's state-law

claims would impose additional warning requirements not identical to the standard

of identity.

---

[9]     And to the extent legislative history plays a role in a plain-text analysis, it
should be Congress's intent that carries the day:  Congress stated that the express
preemption provisions are designed to ensure national uniformity in labeling by
eliminating inconsistent state requirements.  H.R. Rep. No. 101-538, at 7, 1990
U.S.C.C.A.N. 3336, 3337 (June 13, 1990).  This objective would be frustrated if
limited to only "positive nutritional food labels."  *See, e.g., Turek*, 662 F.3d at 426
(stating that it is "easy to see why Congress would not want to allow states to
impose disclosure requirements of their own on packaged food products," because
"[m]anufacturers might have to print 50 different labels").

### 2. The Standard of Identity Preempts Nemphos's Claims Based on State Law Requirements For Allegedly Misleading Marketing Or Advertising.

Nemphos next contends that her claims of "misleading marketing and advertising" of bottled-water products are not preempted. Appellant's Br. 26. But there is no exception to preemption under 21 U.S.C. § 343-1(a)(1) for state law requirements regarding "marketing" or "advertising" of subject matters regulated by FDA. After all, as the Supreme Court has observed, under the FDCA, "[e]very labeling is in a sense an advertisement." *Kordel*, 335 U.S. at 351. And NLEA preemption applies to any state law requirements "concerning the composition *or labeling* of food" that "[a]re not imposed by or contained in the applicable provision" or that "[d]iffer from those specifically imposed by or contained in the applicable provision." 21 C.F.R. § 100.1(c)(4) (emphasis added). To the extent Nemphos means to argue that 21 U.S.C. § 343-1(a)(1) does not preempt claims about marketing in a medium other than "labeling" as that term is broadly used in the FDCA, the allegations in her complaint do not back up her argument. The FDCA defines "labeling" as "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m); *see also Ackerman v. Coca-Cola Co*., CV-09-0395 (JG), 2010 WL 2925955, at *7 n.12 (E.D.N.Y. July 21, 2010) (phrase "vitamins + water = what's in your hand" on an in-store advertisement accompanying the sale

of vitaminwater constituted a statement made in the product's "labeling").  The complaint does not identify any other kind of marketing or advertising.

The case law further supports the conclusion that Nemphos's misleading marketing and advertising claims are preempted by the NLEA.  *See In re PepsiCo, Inc.*, 588 F. Supp. 2d at 527 (S.D.N.Y. 2008).  The Southern District of New York's dismissal of state law claims alleging misleading marketing of bottled water in *In re PepsiCo*, is particularly instructive.  In that case, the plaintiffs alleged that PepsiCo misleadingly marketed Aquafina bottled water by using the words "Pure Water Perfect Taste" and graphics resembling mountains to suggest that Aquafina came from a pure mountain source, when Aquafina water actually came from a public water supply.  *Id.* at 529.  The court held that § 343-1(a)(1) preempted these claims because they rested on state law requirements not identical to the FDA's standard of identity for bottled water—even though the FDA's standard of identity does not specifically allow stylized mountain ranges or the words "Pure Water Perfect Taste."  *Id.* at 538.  As the Court explained, "state law cannot impose obligations beyond, or different from, what federal law requires"; the plaintiffs' claims relied on non-identical state law duties because the FDA's standard of identity for bottled water addressed the "subject matter" of purity and source disclosure and did not require labeling Aquafina as tap water.  *Id.* at 532, 538.

The court in *PepsiCo* also expressly rejected the argument that a state-law requirement is not preempted unless the FDA's standard of identity specifically allows every marketing statement at issue. *Id.* at 538-39. The *PepsiCo* opinion thus strongly supports the dismissal of Nemphos's claims here. The subject matter of fluoride—like the "purity" subject matter at issue in *PepsiCo*—is clearly addressed in FDA's standard of identity.

*PepsiCo* also expressly rejected the argument—also advanced by Nemphos here—that *Vermont Pure Holdings v. Nestle Waters North America*, No. Civ. A. 03-11465, 2006 WL 839486 (D. Mass. Mar. 28, 2006), suggests that § 343-1(a)(1) does not apply to claims alleging that the marketing of bottled water is false or misleading. *See* Appellant's Br. 26. The plaintiff in *Vermont Pure* alleged that Poland Spring water was misleadingly marketed as "pure, even though Poland Spring is aware of contamination, and the potential for contamination of its water sources"; the court there allowed these claims because "the quality claims do not arise out of a term that is specifically defined by the FDA." *Vermont Pure*, 2006 WL 839486 at *7-8. The *PepsiCo* court explained, however, that "unlike the 'purity' claims regarding the 'spring water' at issue in *Vermont Pure*, which the court concluded were unaddressed by federal law, the federal standard of identity for 'purified water' explicitly regulates purity requirements. Thus, the 'purity' field is not open as to purified water, as the *Vermont Pure* court held it was as to spring

water." *PepsiCo*, 588 F. Supp. 2d at 538. Accordingly, the *PepsiCo* court concluded that it would "reject [the p]laintiffs' reading of *Vermont Pure* to stand for the principle that state requirements are permitted as long as the federal standard does not specifically address the terms or images at issue." Rather, the court went on, "[w]here federal requirements address the subject matter that is being challenged through state law claims, such state law claims are preempted to the extent they do not impose identical requirements." *Id.*

So too here. As *PepsiCo* makes clear, because FDA's standard of identity addresses the "subject matter" of fluoride in bottled water, that "field is not open" to non-identical state law duties. *Id.*[10]

Next, Nemphos points to the FDA's statement in rulemaking "encourag[ing] manufacturers to provide" information about "unwanted aesthetic effects from excessive doses of fluoride." Appellant's Br. 30. But the FDA ultimately declined to *require* such a warning, stating that "FDA does not agree that this statement should be mandatory on all bottled waters containing 0.3 ppm or more fluoride."

[10]    Nemphos cannot escape preemption under 21 U.S.C. § 343-1(a)(1) by asserting (in a footnote) "misbranding" under 21 U.S.C. § 343(a). Appellant's Br. 28 n.9. Nemphos's charge of misbranding does nothing more than repeat her claims that marketing statements on the bottled water at issue are misleading— precisely the type of claims dismissed as preempted in *PepsiCo*, 588 F. Supp. 2d at 538-39. *See also Mills*, 441 F. Supp. 2d at 107 n. 5 ("[Plaintiffs'] concern is not that defendants have omitted information set forth in the standard of identity and therefore have misbranded, but rather that the mandated information in the standard of identity is insufficient. Plaintiffs seek to supplement the standard of identity's labeling, not enforce compliance with the existing requirements.").

- 33 -

60 Fed. Reg. at 57080.   Where the FDA expressly declines to require a statement but allows it as optional, a state law *requiring* what FDA does not is still a "requirement" that is "not identical" under § 343-1(a)(1).   Indeed, as the Seventh Circuit explained in *Turek* , 662 F.3d at 427, "[e]ven if the disclaimers that the plaintiff wants added would be consistent with the requirements imposed by the Food, Drug, and Cosmetic Act, consistency is not the test; identity is. Maybe such disclaimers would be a good thing * * * and the FDA should require them, but that is irrelevant to this appeal."   Nemphos's argument simply is not relevant here, where the inquiry is whether state law requirements are not identical to the FDA's standard of identity for bottled water.  *See* 21 C.F.R. § 100.1(c)(4).

Whether styled as failure-to-warn or misleading marketing, Nemphos's state-law claims attack the permissible level of fluoride in bottled water.   The District Court properly found that FDA's regulation of bottled water labeling preempts Nemphos's claims under Section 343-1(a)(1).

### B.    The "Safety" Exception Does Not Apply.

There is a limited exception to the NLEA's preemptive force:  the preemption provision does not apply "to any requirement respecting a statement in the labeling of food that provides for a warning concerning the safety of the food or component of the food."  Pub. L. No. 101-535, § 6(c), 104 Stat. 2353, 2364

(1990).  The District Court correctly concluded that the "safety" exception had no

application here.  *See* JA 43-45.

### 1.   The FDA Has Determined that Fluoride Is a Safe Food Additive in Bottled Water.

The District Court correctly found that the "safety" exception does not apply

where the FDA has approved the use of fluoride as a food additive in bottled water.

The fact that the FDA established regulations allowing the use of fluoride as

a food additive in and of itself shows that the FDA found these allowed uses of

fluoride to be safe through its approval process.  The Food Additive Amendments

of 1958, Pub. L. No. 85-929, 72 Stat. 1784 (1958), charge the FDA with

responsibility for regulating "food additives"—defined as "any substance the

intended use of which results or may reasonably be expected to result, directly or

indirectly, in its becoming a component or otherwise affecting the characteristics

of any food."  21 U.S.C. § 321.  Under the Food Additive Amendments, a food

additive may not be introduced into commerce *unless the FDA first determines that

it is safe*.  21 U.S.C. §§ 331, 342(a)(2)(C), 348(a).  The presumption that all food

additives are unsafe may be overcome if the food additive is used in conformity

with a regulation "prescribing the conditions under which such additive may be

safely used."  21 U.S.C. § 348(a).  Thus, when the FDA enacted 21 C.F.R.

§ 170.45, which allows fluoride to be added to bottled water at the levels set forth

in 21 C.F.R. § 165.110, the FDA determined that those fluoride levels are safe.

The District Court thus correctly concluded that the warnings concerning safety exception did not apply because "FDA has already determined that fluoride is safe to include in bottled water * * * if manufacturers abide by its regulations," and "Nemphos's allegations show the Defendants complied with those regulations." JA 44.

The District Court for the Western District of Missouri reached the same conclusion in *In re BPA,* 2009 WL 3762965 (W.D. Mo. Nov. 9, 2009). The plaintiffs in *In re BPA* sought damages from infant formula manufacturers and others for allegedly failing to disclose that the lining of infant formula containers contained Bisphenol-A (BPA). *Id.* The court found that the plaintiffs' claims were expressly preempted by Section 343-1. It further concluded that the safety exception did not apply because the FDA, as part of its approval of BPA as a food additive, had already determined that BPA was safe. *Id.* at *6. In light of the FDA's safety finding, the court concluded that there was no basis to invoke the safety exception. *Id.* The court went on to address congressional intent in enacting 21 U.S.C. § 343-1(a) and the safety exception, finding that "Congress expressed its intent that states occupy a more restricted role in the context of food ingredient labeling, and applying the safety exception with deference to the FDA's determination of safety effectuates Congress' intent." *Id.*

- 36 -

In sum, because the allegations in the complaint demonstrate that the Appellees complied with the fluoride levels set forth in 21 C.F.R. § 165.110(b)(4)(ii), the NLEA safety exception will not insulate Nemphos's claims from preemption. *Compare* JA 9-10 (alleging that Deer Park, Poland Spring, and Dannon Fluoride to Go fluoridated bottled water contain "up to 0.8 ppm fluoride.") *with* 21 C.F.R. § 165.110(b)(4)(ii) (allowing between 0.8 and 1.7 ppm fluoride depending on air temperature for bottled water with added fluoride manufactured in the United States and up to 0.8 ppm fluoride for bottled water with added fluoride manufactured outside the United States).

### 2.    Dental Fluorosis Is Not a "Safety" Concern.

The District Court also correctly held that the NLEA's narrow exception to express preemption for "a warning concerning the safety of the food or component of the food," Pub. L. No. 101-535, § 6(c), 104 Stat. 2353, 2364 (1990), does not apply here because dental fluorosis does not implicate "safety" concerns as the FDA uses that term.

In the context of food additives, the FDA defines the adjective "safe" to mean "that there is a reasonable certainty in the minds of competent scientists that the substance is not harmful under the intended conditions of use."   21 C.F.R. § 170.3. "Safety" – the quality of being safe – does not require "a demonstration of absolute harmlessness."  *See* 61 Fed. Reg. 3118, 3119 (Jan. 30, 1996) (citing H.R.

Rep. No. 85-2284, at 4-5 (1958); S. Rep. No. 85-2422, at 2 (1958)).  Nor does

safety require "proof beyond any possible doubt that no harm will result under any

conceivable circumstance."  *Id.*  Rather, "an effect is harmful if it affects health,

not if it is simply an undesirable or unexpected effect that has no adverse health

consequences."  *Id.* at 3120.[11]  Put another way, "harm" means "the capacity to

injure or otherwise damage the health of individuals consuming the additive," *id.* at

3119 (citing H.R. Rep. No. 85-2284, at 4-5 (1958)), and a food is "harmful" if it is

"hazardous to the health of man or animal," *id.* (citing H.R. Rep. No. 85-2284 at 4

(1958)), or can cause "significant adverse health consequences."  *Id.* at 3168.

For purposes of food "safety" under the FDCA, "harm" does not include

dental fluorosis.  Instead, dental fluorosis constitutes an "undesirable or

unexpected effect with no adverse health consequence," but not an "adverse health

consequence" raising a *safety* concern.  Indeed, the FDA has consistently rejected

the position that low levels of fluoride or dental fluorosis pose an adverse health

risk.  For example, when proposing amending and recodifying regulations

concerning bottled water in 1993, the FDA described dental fluorosis as a

---

[11]    For example, FDA has required warnings to address "serious allergic-type
responses," *see* 44 Fed. Reg. 37212, 37213 (June 26, 1979) (foods containing
Yellow No. 5 must declare its presence because it can cause "serious allergic-type
responses" with "serious health implication[s]"), and warnings to highlight the
prospect of "serious illness or death."  *See, e.g.,* 21 C.F.R. § 101.17(e), 59 Fed.
Reg. 51030, 51031 (Oct. 6, 1994) (certain iron-containing dietary supplements
must warn consumers that accidental overdose of iron-containing products is the
leading cause of fatal poisoning in children under six years of age).

"significant adverse *aesthetic* effect[]," not a "health" effect.  58 Fed. Reg. 393, 401 (Jan. 5, 1993) (emphasis added).  The FDA explained that its regulations governing fluoride levels were made with dental fluorosis in mind not to prevent a negative "health effect," but rather to "protect consumers from any adverse effects on the body, *even those that may be characterized as aesthetic*."  *Id.* (emphasis added); *see also Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 883 (D.C. Cir. 2004) ("FDA interpretations of the FDCA receive deference").

The FDA has also distinguished between low levels of fluoride that could cause dental fluorosis and higher levels of fluoride that could cause the more severe condition of skeletal fluorosis.  For instance, when proposing a rule for drug products to relieve oral discomfort, the FDA noted that while dental fluorosis had been reported from daily intake of water with 2 to 10 ppm of fluoride, the more serious condition skeletal fluorosis had not been reported until daily water intake reached levels of 20 to 80 ppm fluoride.  47 Fed. Reg. 22712, 22751 (May 25, 1982).  *See also Natural Res. Def. Council, Inc. v. E.P.A.*, 812 F.2d 721 (D.C. Cir. 1987) (upholding EPA's similar conclusions that (1) dental fluorosis was not a health effect and (2) a maximum contaminant level goal of 4.0 ppm fluoride protected against skeletal fluorosis with an adequate margin of safety).

The District Court here took all this into account in rendering its ruling on the "safety" exception.  After cataloguing the agency's definitions of "safety" and

- 39 -

"harm," examining the D.C. Circuit's opinion in *NRDC v. EPA*, and explaining that the agency considers dental fluorosis an "aesthetic" effect, the District Court correctly found that "the FDA, when considering the consequences of consuming fluoride, did not consider dental fluorosis injurious to one's health but rather an adverse aesthetic effect." JA 43-45.

The federal District Court for the District of Columbia reached a similar conclusion in *Mills*. In that case, the court concluded that the gastrointestinal symptoms of lactose intolerance were not "safety" concerns. *Mills*, 441 F. Supp. 2d at 108-109. Like the gastrointestinal symptoms outlined in *Mills*, the cosmetic effects of dental fluorosis may be undesirable, but the agency has concluded that they do not present a genuine risk of significant adverse health consequences. As the district court in *Mills* correctly found with respect to milk, and as the District Court here found with respect to water, there is no basis here to invoke the "safety" exception to the NLEA's express preemption provision.

## II. NEMPHOS'S INFANT FORMULA AND BABY FOOD CLAIMS ARE PREEMPTED.

### A. Nemphos's Claims Are Preempted Because They Are "Implied Nutrient Content Claims."

Nemphos spends all of a page contending that her infant-formula and baby food claims should be revived. But the District Court correctly held that her claims regarding infant formula and baby food are also preempted under Section 343-1(a).

*See* JA 34 (citing Section 343-1(a)(5)); JA 38-39 (dismissing Nemphos's infant-

formula and baby-food claims based on the Seventh Circuit's Section 343-1(a)(5)

preemption holding in *Turek*, 662 F.3d at 427).

Under Section 343-1(a)(5) of the NLEA, no State may establish "any

requirement respecting any claim of the type described in section 343(r)(1) of this

title made in the label or labeling of food that is not identical to the requirement of

section 343(r)."  Section 343(r)(1), in turn, prohibits any claim that "(A)

characterizes the level of any nutrient which is of the type required by paragraph

(q)(1) or (q)(2) to be in the label or labeling of the food" or "(B) characterizes the

relationship of any nutrient which is of the type required by paragraph (q)(1) or

(q)(2) to be in the label or labeling of the food to a disease or a health-related

condition" unless that claim is otherwise authorized under Section 343(r).

The FDA's implementing regulations further explain what types of claims

fall under Section 343(r)(1)(A) and (B).  The FDA recognizes two types of claims

under Section 343(r)(1): nutrient content claims and health claims.  *See* 21 C.F.R.

§§ 101.13, 101.14.  The FDA defines a "nutrient content claim" as a statement that

"characterizes the level" of a nutrient in a food.  21 C.F.R. § 101.13(b).  An

"implied nutrient content claim" is "any claim that * * * [d]escribes the food or an

ingredient therein in a manner that suggests that a nutrient or an ingredient is

absent or present in a certain amount (e.g., 'high in oat bran')"; such claims can be

made expressly or by implication, *id.*, and "must comply with paragraph (a) of this section."  21 C.F.R. § 101.65(c)(1); *see also* 21 C.F.R. § 101.13(b)(2).

Paragraph (a) in turn requires the claim to use one of the defined terms, comply with the general requirements of 21 C.F.R. Part 113, and to bear nutrition labeling.  *Id.* § 101.65(a).  For example, the claim "high in oat bran" is an implied nutrient content claim about fiber because consumers associate oat bran with fiber content.  58 Fed. Reg. 2302, 2370 (Jan. 6, 1993); *see also* 21 C.F.R. §§ 101.13(b)(2), 101.65(b)(5).  Nutrient content claims are entirely voluntary; FDA regulations do not require that product labels bear nutrient content claims.

A claim suggesting that fluoride is present in a certain amount in a product is an "implied nutrient content claim."  *See* 21 C.F.R. 101.13(q)(8) (Providing an exemption to general nutrient content claim regulations for the use of "fluoridated, fluoride added or with added fluoride" on bottled water).  Dental fluorosis is unique in that it can only result from the presence of fluoride at higher levels. Accordingly, a warning regarding dental fluorosis inherently "characterizes the level" of fluoride present in the product as at or exceeding the levels capable of causing dental fluorosis and would therefore be a fluoride nutrient content claim, much in the same way as the statement "high in fluoride."

Requiring an implied nutrient content claim regarding fluoride conflicts with 21 U.S.C. § 343(r).  Section 343(r)(1)(A) only permits nutrient content claims that

are either: (1) authorized by FDA regulations; (2) authorized in response to a petition filed with the FDA; or (3) permitted under the Food and Drug Administration Modernization Act (FDAMA) notification process set forth in Section 343(r)(2)(G).  FDA regulations further provide that "no nutrient content claims may be made on food intended specifically or use by infants and children less than 2 years of age unless the claim is specifically provided for in parts 101, 105, or 107 of this chapter."  21 C.F.R. 101.13(b)(3).  The FDA has not authorized any nutrient content claims regarding fluoride in infant formula or baby food consistent with 21 U.S.C. § 343(r)(1)(A) and 21 C.F.R. § 101.13(b)(3).

Preemption under 21 U.S.C. § 343-1(a)(5) applies both to claims premised on failure-to-warn theories and claims premised on fraud-based theories such as allegations of misleading marketing.  As the Supreme Court made clear in *Bates v. Dow Agrosciences*, 544 U.S. at 446, claims based on fraud and failure to warn "are premised on common-law rules that qualify as 'requirements for labeling or packaging.' "  And courts have consistently recognized that federal law preempts claims that would require labeling that is not identical to labeling required by the FDA under Section 343(r)—including claims that would require additional warnings or disclaimers.  *See, e.g., Turek*, 662 F.3d at 427 ("The disclaimers that the plaintiff wants added to the labeling of the defendants' inulin-containing chewy

- 43 -

bars are not identical to the labeling requirements imposed on such products by federal law, and so they are barred").[12]

The District Court plainly understood all of this. Among other things, the court based its discussion of Nemphos's infant formula and baby-food claims on the Seventh Circuit's express preemption opinion in *Turek*, 662 F.3d at 427, where the Seventh Circuit affirmed the dismissal of claims regarding the fiber labeling of chewy granola bars under Section 343-1(a)(5). 662 F.3d at 426-427 (describing

---

[12]    *See also Dvora v. General Mills, Inc.*, No. CV 11-1074-GW, 2011 WL 1897349, at *4-5 (C.D. Cal. May 16, 2011) (action seeking to require labeling stating that a blueberry and pomegranate flavored cereal did not contain blueberries and pomegranates was preempted because FDA regulations did not require such labeling.); *Henderson v. Gruma Corp.*, No. CV 10-04173-AHM, 2011 WL 1362188, at *13 (C.D. Cal. Apr. 11, 2011) (action alleging that the statements "0 g transfat" and "0 g cholesterol" were misleading was preempted because FDA regulations permitted such claims.); *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1121 (N.D. Cal. 2010) ("Accordingly, if 'nutritionally insignificant amounts' of less than 0.5 gram trans fats means the same thing, according to Agency regulations, as '0 grams,' then * * * the plaintiffs' state law claims therefore seek to impose a non-identical burden"); *Yumul v. Smart Balance, Inc.*, No. CV 10-00927-MMM, 2011 WL 1045555, at *9 (C.D. Cal. Mar. 14, 2011) ("Because Yumul seeks to enjoin Smart Balance from labeling its product 'healthy'—something the FDA regulations expressly permit Smart Balance to do—a liability finding in this case would impose a requirement 'that is not identical' to federal law requirements."); *Red v. Kroger Co.*, No. CV 10-01025-DMG, 2010 WL 4262037, at *7 (C.D. Cal. Sept. 2, 2010) (action alleging that the terms "0g of Trans Fat" and "cholesterol free" were misleading was preempted because FDA regulations allowed such claims.); *Fisher v. Monster Beverage Corp.*, No. EDCV 12–02188–VAP, 2013 WL 4804385, at *11 (C.D. Cal. July 9, 2013) ("Plaintiffs seek to impose an obligation to post certain warnings that are not imposed by the FDA. Accordingly, the NLEA preemption provision applies").

preemption of requirements for disclaimers not identical to the FDA's regulations governing nutrient content claims and health claims relating to fiber).

### B.   Nemphos's Claims Also Are Preempted Because They Are "Health Claims."

Additionally, while the District Court did not dismiss Nemphos's claims on health-claim grounds, it would not have erred by doing so.  The FDA defines "health claims" as "any claim made on the label or in the labeling of a food, including a dietary supplement, that expressly or by implication * * * characterizes the relationship of any substance to a disease or health-related condition."  21 C.F.R. § 101.14(a)(1).  And the FDA defines "disease or health-related condition" to mean "damage to an organ, part, structure, or system of the body such that it does not function properly (e.g., cardiovascular disease), or a state of health leading to such dysfunctioning."  21 C.F.R. § 101.14(a)(5).  "Health claims" are only permitted if (1) specifically authorized in FDA regulations, or (2) permitted under the FDAMA notification process in Section 343(r)(3)(C).  *See Turek*, 662 F.3d at 426-427 (concluding that Section 343-1(a)(5) preempted sought-after labeling disclaimers stating that inulin produces fewer health benefits than "natural" fiber, could cause stomach problems, or that inulin from chicory root should not be consumed by pregnant or lactating women).  FDA regulations further prohibit health claims where "food is for infants and toddlers less than 2 years of

age except if the claim is specifically provided for in subpart E of this part." 21 C.F.R. 101.14(e)(5).

The FDA and the courts interpret "disease or health related condition" broadly in practice and do not impose a minimum threshold of "seriousness" for a condition to be eligible for a health claim. Health claims can link substances to conditions ranging from largely aesthetic defects (such as eczema) to life-threatening conditions such as coronary heart disease. The FDA has issued a health claim regulation that characterizes the relationship between dietary carbohydrates and a reduced risk of dental caries (i.e., tooth decay) at 21 C.F.R. § 101.80(a) and has authorized a FDAMA health claim that bottled water containing greater than 0.6 ppm and up to 1.0 ppm fluoride may bear the claim "Drinking fluoridated water may reduce the risk of dental caries or tooth decay."[13] The FDA also has authorized a qualified health claim for the relationship between 100% whey-protein partially hydrolyzed infant formula and a reduced risk of atopic dermatitis, which is a form of infant eczema. Letter from Dr. Barbara

---

[13]    *See* FDA, *Health Claim Notification for Fluoridated Water and Reduced Risk of Dental Caries*, *available at* http://www.fda.gov/food/ingredientspackaginglabeling/labelingnutrition/ucm073602.htm (last modified Apr. 18, 2013).

Schneeman, FDA, to Melanie Fairchild-Dzanis, Regulatory Discretion, Inc. (May 24, 2011).[14]

A warning regarding fluoride and dental fluorosis is a health claim because it links the substance fluoride with dental fluorosis. Dental fluorosis is an aesthetic condition falling within the definition of a "health related condition" under the broad application of that term by the FDA and the courts. Requiring a statement that the fluoride in a product increases the risk of dental fluorosis would establish a requirement that is not identical to the FDA's regulations. No FDA regulation requires such a claim, and no such claim lawfully may be made absent pre-market authorization from the FDA. Thus, for this additional reason, Section 343-1(a)(5) preempts state-law claims premised on requiring that the products at issue here bear labeling regarding fluoride and dental fluorosis.

The District Court's ruling as to Nemphos's infant-formula and baby-food claims was correct. Because Appellant's claims are based on state-law requirements for infant formula and baby food that are not identical to the

---

[14]     *Available at* http://www.fda.gov/Food/IngredientsPackagingLabeling/ LabelingNutrition/ucm256731.htm. In addition to authorizing health claims for conditions that are largely aesthetic, such as eczema, FDA subjects many articles to regulation as "drugs" that are cosmetic in nature. For example, FDA identifies "fluoride toothpaste, antiperspirants, dandruff shampoos and sunscreens" on its website as examples of products that are subject to regulation as drugs even though they are used primarily for cosmetic purposes. *See* http://www.fda.gov/ aboutfda/transparency/basics/ucm192696.htm. FDA similarly has regulated as drugs products that treat baldness, like *Rogaine®,* as well as products that remove wrinkles, such as *Botox®.*

requirements of 21 U.S.C. § 343-1(a)(5), Nemphos's claims regarding infant food and baby formula are preempted.

## III.  THE DISTRICT COURT CORRECTLY DENIED LEAVE TO AMEND.

In the closing sentence of Nemphos's brief, she asks this Court to reverse the District Court's conclusion that leave to amend would be denied as futile. Appellant's Br. 41.  The District Court did not abuse its considerable discretion in denying leave to amend; in fact, the court was completely correct.

To begin with, Nemphos has filed three versions of the complaint.  She filed her first complaint against most of these defendants in the fall of 2011, amended it, and then dismissed it.  She filed this latest complaint in the fall of 2012.  Leave to file a *fourth* iteration of a complaint should not be hastily given.  *See Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474, 480 (4th Cir. 2006)**.**  And the District Court had good reason not to give it here:  Nemphos's claims all were preempted by federal law.  And because of the preemptive force of Section 343-1(a), there was no prospect that Nemphos could evade application of that federal statute with a differently crafted complaint.  The third version of the complaint was not the charm for Nemphos; her complaint was properly dismissed with prejudice.

## CONCLUSION

Nemphos brought a broad and scattershot complaint about the dangers of baby food, infant formula, and fluoridated water—all of which products are safe and thoroughly regulated by FDA.  All of her claims are preempted.

For all of the foregoing reasons, the District Court's judgment should be affirmed.


Dated:          January 31, 2014              Respectfully submitted,

/s/ Victoria J. Miller                          /s/ Catherine E. Stetson
Victoria J. Miller                              Catherine E. Stetson
Kristin M. Hadgis                               Michael L. Kidney
MORGAN, LEWIS & BOCKIUS LLP                     HOGAN LOVELLS US LLP
1701 Market Street                              555 Thirteenth Street, N.W.
Philadelphia, PA 19103                          Washington, DC 20004
Tel: 215-963-5000                               Tel: 202-637-5600
Fax: 215-963-5001                               Fax: 202-637-5910
vmiller@morganlewis.com                         cate.stetson@hoganlovells.com
khadgis@morganlewis.com                         michael.kidney@hoganlovells.com

*Counsel for Appellee The Dannon                Lauren S. Colton
Company, Inc.*                                  HOGAN LOVELLS US LLP
                                                100 International Drive, Suite 2000
                                                Baltimore, MD  21202
                                                Tel: 410-659-2700
                                                Fax: 410-659-2701
                                                lauren.colton@hoganlovells.com

                                                *Counsel for Appellees Nestlé USA, Inc.,
                                                Nestlé Waters North America Inc., and
                                                Gerber Products Company*

## STATEMENT REGARDING ORAL ARGUMENT

There is no need for oral argument in this appeal.  The language of the express preemption provisions at issue is clear, and the facts alleged in the Complaint and legal arguments regarding dismissal are adequately presented in the briefs and record.  The Court's decisional process would not be significantly aided by oral argument.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. R. 32(a)(7)(B) because this brief contains 12,555 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.

/s/ Catherine E. Stetson
Catherine E. Stetson

*Counsel for Appellees Nestlé USA, Inc., Nestlé Waters North America Inc., and Gerber Products Company*

January 31, 2014

## CERTIFICATE OF SERVICE

I certify that on January 31, 2014, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ Catherine E. Stetson
Catherine E. Stetson

January 31, 2014